JOURNAL ENTRY and OPINION
Defendant-appellant Surendra Ramjit appeals from his conviction after a jury trial of aggravated murder with gun specifications.
Appellant challenges his conviction on several grounds. He asserts the trial court improperly admitted the testimony of appellant's co-defendant and testimony concerning events preceding the murder, improperly prohibited defense counsel from arguing their objections, improperly neglected to give curative instructions to the jury during the course of trial, and improperly substituted an alternate juror when a member of the jury was dismissed for cause after deliberations had begun. Appellant further asserts the prosecutor engaged in misconduct when he attempted to introduce the testimony of appellant's co-defendant. Finally, appellant claims his conviction is not supported by the weight of the evidence.
After a thorough review of the extensive record in this case, this court finds a reversal of appellant's conviction is unjustified; therefore, appellant's conviction and sentence are affirmed.
Appellant's conviction results from his association with a group of young people who lived in the area of Bedford, Northfield and Macedonia, Ohio. Appellant, whose family emigrated originally from Trinidad, attended Nordonia High School. While pursuing his studies, appellant obtained part-time employment at a Builder's Square store in Oakwood Village. There, he met the victim in this case, Clifford Beller. Through Beller, appellant met several other young men. One of these young men was Bobby Johnson, Jr., with whom appellant developed a close friendship.
Johnson eventually became involved in a rap group that consisted of some friends and family members, including his cousin, Laquan Stowers. The members of the group occasionally funded their enterprise by selling marijuana. Stowers was entrusted with the proceeds of the sales; however, sometime in the later part of 1998, Stowers used a portion of the group's money to have his automobile repaired. This act soon led to a rift between the cousins, with their various friends thereafter being forced to choose sides in the dispute. Appellant remained loyal to Johnson; Beller became more closely associated with Stowers.
On the evening of January 12, 1999 Stowers and his friends visited the home of one of the female members of their clique. This young woman's house was located across the street from Johnson's home. Beller, one of the few in the group who had the use of a vehicle, brought with him Stowers and two other friends, Clarence Harris and Michael Knapp. Sometime thereafter, Beller's best friend, Sean Alvis, arrived.
Eventually, the group felt the need for some additional enhancement of their festivities. Knapp volunteered to cross the street to ask Johnson to sell him some marijuana.
Upon his arrival at Johnson's residence, Knapp observed appellant also was there. Knapp's attempts to persuade Johnson to accede to his request met with resistance since Johnson was aware Knapp associated with Stowers. Knapp still was engaged in his effort when Harris, too, arrived at Johnson's door to buy a "blunt."[1]
Harris was Stowers' closest ally; thus, his temerity at taking this action incensed both Johnson and appellant. Johnson brandished a knife at Harris, and appellant shouted at him, ordering him off of Johnson's property.
Appellant's belligerence sparked Harris's anger as well as his retreat. When he and Knapp returned to the girl's garage where the group had gathered, Harris informed Stowers of the reception he had received and told Stowers he would like to fight with appellant. They all discussed the matter for a time, then noticed Johnson and appellant emerge from the house.
As the two approached Johnson's Cadillac, parked on the street, Harris "ran outside and started arguing" with appellant and Johnson. Stowers and the other members of his clique, including Beller, followed. Harris removed his shirt in preparation for a fight with appellant. Appellant, however, refused to engage with the larger and more powerful Harris. Instead, he stared at Stowers while Harris insulted him and Johnson.
Some of the cooler observers of the altercation managed to persuade Johnson and appellant to enter the Cadillac. After the two had left, Stowers' group continued with their party for a time, then Beller provided a ride home to most of the young men.
After Harris had disembarked from Beller's vehicle, Beller and Sean Alvis proceeded to a restaurant where they applied for employment. Upon being informed they should start working the following day, they proceeded to Alvis's house to attend a birthday party.
The two were there for approximately an hour when Johnson telephoned. Johnson spoke to Alvis only briefly before requesting Beller. Following the telephone conversation, Beller informed Alvis he had to leave to "pick up some money." Alvis surmised Johnson had decided to repay a debt he owed Beller. The two of them thereupon left the birthday party. Beller first drove Alvis to the apartment complex where he and Beller had been staying with friends, then drove away from there alone at approximately 11:00 p.m. Alvis observed him exit the parking lot. Beller turned his vehicle left onto Sagamore Road rather than using the more typical right turn, which led to Northfield Road.
At approximately 1:20 a.m. on January 13, 1999, Walton Hills Police Sergeant David Choba was on routine patrol westbound on Sagamore Road when he observed a vehicle parked in the Metroparks picnic area. The unlit vehicle was not parked in a "normal parking space." In view of the hour and the extremely inclement weather, Choba decided to investigate. He engaged his cruiser's video camera before exiting.
As Choba approached the vehicle, he observed what "appeared to be steam coming off the vehicle," leading him to believe it only recently had arrived in the lot.[2] Choba noticed "what appeared to be two bullet holes in the front windshield of the vehicle." Upon closer observation, Choba saw the driver of the vehicle, later identified as Clifford Beller, sitting back in his seat with his head "slumped slightly to his right." Beller's head was bloody, and he quite obviously was dead. At that point, Choba radioed for additional assistance and notified ranger headquarters of the occurrence of a possible homicide on Metroparks property.
Although investigation of the case quickly was assigned to Ranger Sergeant John Manzatt, the hazardous road conditions prevented Manzatt from arriving on the scene until approximately 2:30 a.m. While Choba waited, he took some photographs and performed some cursory investigation of the crime scene. Some tire tracks, footprints and blood spots existed in the area of the vehicle and the parking lot. A check of the vehicle's license, moreover, provided the victim's name.
Thereafter, Manzatt took additional photographs, obtained samples of the blood spots and also located the murder weapon buried in the snow a short distance from Beller's vehicle. The subsequent autopsy of Beller's body indicated he had been shot with the .40 caliber semiautomatic handgun at least three times in the head at close range.
Some of the bullets shot from the handgun also had struck the interior of Beller's vehicle; one was lodged in the steering wheel. Forensic analysis of the body and the vehicle further indicated a significant amount of "blow back" of the victim's blood and brain matter had occurred during the shooting; thus, the perpetrators of the crime, who had been seated in the rear passenger seat, would have been marked with it. During the daytime hours of January 13, 1999 Manzatt began interviewing Beller's family and friends.
At approximately 11:30 a.m. that day, appellant telephoned a friend to request a ride home from Johnson's house. Johnson thereafter was observed cleaning both the exterior and the interior of his Cadillac, which he had placed inside the home's garage.
On January 14, 1999 Manzatt interviewed Johnson in connection with the murder. During that first interview, Johnson provided appellant's telephone number. Manzatt arranged for appellant to be interviewed by another ranger detective the following afternoon.
On the morning of January 15, 1999 Johnson's mother contacted Manzatt to arrange another interview with her son. This second interview with Johnson took place at nearly the same time appellant's was underway at another location.
Appellant told the investigator during his interview that he had last seen Beller on the evening of January 12, 1999. He stated after he and Johnson left Johnson's house, they proceeded to a sports bar in Solon, Ohio. Appellant stated he had obtained a ride home a while later from a friend of his older brother and had remained at home the remainder of the night. The brother's friend, however, later stated he had not driven appellant that night.
As a result of Johnson's statements to Manzatt, at the conclusion of their interviews, both appellant and Johnson were placed under arrest. Portions of the murder investigation that had not yet been completed continued.
On January 21, 1999 appellant and Johnson were indicted together on one count of aggravated murder, R.C. 2903.01(A) (murder committed with prior calculation and design); the indictment also contained two firearm specifications. Appellant's case proceeded separately from Johnson's. The record reflects Johnson was convicted of the charge prior to the commencement of appellant's trial.
Appellant's case proceeded to a jury trial on October 15, 1999. The state presented the testimony of thirty witnesses during its case-in-chief; these included many of Beller's and appellant's associates, several forensic examiners, and Manzatt. Although called as a prosecution witness, Johnson refused to provide any significant testimony regarding the events of January 12 and 13, 1999. The state also introduced into evidence over two hundred exhibits.
Following the trial court's denial of his motion for acquittal, appellant presented the testimony of his mother and of an acquaintance, who also was his older brother's employee. Appellant's mother testified appellant remained with her on January 12, 1999 after he arrived home at approximately 10:00 p.m. Following her testimony, the state called as a rebuttal witness Manzatt, who indicated appellant's mother had told him two different stories concerning appellant's whereabouts on the night of the murder.
The jury ultimately returned a verdict of guilty of aggravated murder with the specifications. The trial court subsequently sentenced appellant to a term of incarceration of three years for the firearm specifications, to be served prior to and consecutively with a life sentence without the possibility of parole for twenty years.
Appellant has filed a timely appeal of his conviction. He presents nine assignments of error, which will be addressed in logical order and combined where appropriate.
Appellant's second, third, sixth, seventh, fourth and eighth assignments of error state:
 II. THE TRIAL COURT COMMITTED PLAIN ERROR IN THE INTRODUCTION OF THE TESTIMONY OF A CONVICTED CO-DEFENDANT, DESPITE HIS ASSERTION OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT, AND THEN HOLDING HIM IN CONTEMPT FOR FAILURE TO ANSWER.
 III. THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING TESTIMONY OF DETECTIVE MANZATT REGARDING INFORMATION FROM THE CONVICTED CO-DEFENDANT TO BE BROUGHT TO THE JURY, WHEN SUCH EVEIDENCE (SIC) IS IMPROPER AND UNRELIABLE.
 VI. THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF INADMISSIBLE EVIDENCE BY STATING THE DEFENSE (SIC) HAD OPENED THE DOOR TO SUCH EVIDENCE.
 VII. THE MISCONDUCT OF THE PROSECUTION OF PUTTING THE CO-DEFENDANT ON THE STAND TO TESTIFY WITHOUT HAVING INTERVIEWED HIM PREVIOUSLY RESULTED IN PREJUDICE TO THE APPELLANT.
 IV. THE TRIAL COURT CAUSED IRREVERSIBLE HARM AND PREJUDICE WHEN IT DENIED DEFENSE COUNSEL THE OPPORTUNITY TO EXPLAIN REASONING BEHIND THEIR OBJECTIONS AT CRUCIAL TIMES THROUGHOUT THE TRIAL, UNTIL IT WAS TOO LATE AND THE OBJECTED TO EVIDENCE WAS PERMITTED.
 VIII. THE CONTINUOUS ERRORS OF THE COURT WITH NO CURATIVE INSTRUCTIONS RESULTED IN SUBSTANTIAL HARM AND PREJUDICE TO THE APPELLANT.
In these assignments of error, appellant challenges the ultimate admission of certain statements Johnson made to Manzatt during the interview that took place between the two on January 15, 1999.
Appellant initially contends the trial court acted outside its prerogative when it first urged Johnson to answer questions put to him by the prosecuting attorney, then informed Johnson he would be held in contempt of court if he continued to refuse to answer even innocuous questions.
Appellant, however, lacks standing to challenge the trial court's actions with regard to Johnson's assertion of his Fifth Amendment privilege against self-incrimination since that privilege is personal in nature and, thus, may be challenged only by Johnson. State v. Jenkins (1984), 15 Ohio St.3d 164 at 228; State v. Diana (1976), 48 Ohio St.2d 199
at 206; see, also, Couch v. United States (1973), 409 U.S. 322 at 328; cf., State v. Isaacs (1970), 24 Ohio App.2d 115 . Hence, appellant's second assignment of error has no merit.
Appellant next contends the trial court improperly, on the basis of certain questions put to Manzatt on cross-examination, allowed Manzatt, on redirect examination, to detail information given to him by Johnson during their interview.
On cross-examination, defense counsel conducted the following exchange with Manzatt:
 Q. And you cannot sit there, Officer, can you, and tell us how many people were in that MetroParks when this homicide took place at that scene?
[PROSECUTOR]: Objection, your Honor.
THE COURT: Overruled.
Q. Can you?
 A. I learned from Bobby Johnson that there was (sic) just three people there.
 Q. No, sir. I didn't ask you about Bobby Johnson. I asked you from your investigation of the footprints —
[PROSECUTOR]: Objection, your Honor.
 THE COURT: He may answer the question. You asked it. He may answer it. Go ahead, sir.
 A. I learned from Bobby Johnson that at the time of the homicide there were three people there. Bobby Johnson, Surendra Ramjit and the victim, Clifford Beller.
 Q. And Bobby Johnson was convicted of aggravated murder in this case, was he not?
A. Yes.
 Q. And he said to you that he had nothing to do with this homicide at one time, did he not?
A. Yes.
 Q. Now, Officer, when you examined those footprints, I am going to ask you again, from your examination could you tell us how many people were at that homicide?
A. No.
(Emphasis added.)
Thereafter, on redirect examination, the prosecutor asked Manzatt the following:
 Q. Now, Officer, you did find State's Exhibit No. 40 [a grinding tool] in the family room of the [appellant's] home on Roseland Avenue in Moreland Hills, didn't you?
A. Yes, I did.
 Q. And you did find State's Exhibit 38 [the murder weapon] 16 feet from Clifford Beller's body, didn't you?
A. Yes.
 Q. And the shavings from the grinder in State's Exhibit 40 match the shavings from the ground off (sic) area of the gun, don't they?
A. Yes.
 Q. Mr. Peterson asked you about what Bobby Johnson told you happened that night, didn't he?
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
A. Yes.
 Q. And Bobby Johnson did in fact tell you what happened that night didn't he?
A. Yes.
 Q. And Bobby Johnson gave you a written statement that he printed part of with his own hand, did he not?
A. Yes, sir.
 Q. And in that, what Bobby Johnson told you what happened that night, he told you who was down at the Sagamore Grove picnic area that night, didn't he?
* * *
 Q. Who did he tell you was all there when the shots rang out?
 A. Three people only. Surendra Ramjit, himself, Bobby Johnson, and the victim, Clifford Beller.
 Q. And what did Bobby Johnson tell you he was doing when he heard the first shot?
At that point, upon defense counsel's objection, the trial court reviewed the transcript of Manzatt's cross-examination. The trial court then permitted Manzatt to answer the foregoing question. The trial court stated, as the basis for its decision, defense counsel had opened the door to Manzatt's elucidation of Johnson's story. Appellant now contends the trial court's decision was improper. This court disagrees.
The standard to be applied in reviewing the trial court's decision as to the admission of this evidence is one of abuse of discretion. State v. Sage (1987), 31 Ohio St.3d 173.
The phrase opening the door is based upon the doctrine of invited error, pursuant to which a party is prohibited from taking advantage of an error he introduced into the proceedings below. Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co. (1986), 28 Ohio St.3d 20; State v. Woodruff (1983), 10 Ohio App.3d 326 at 327; State v. Miller (1988),56 Ohio App.3d 130 at 132.
A review of the record demonstrates the trial court did not abuse its discretion in making its decision. Defense counsel gave no indication to the trial court he considered Manzatt's answers on cross-examination were unresponsive. Furthermore, counsel failed to request that Manzatt's answers be stricken. The trial court correctly concluded that defense counsel's actions invited the subsequent questions to the witness on redirect examination. By attempting, himself, to introduce testimony concerning his co-defendant's statements to Manzatt, appellant waived any challenge to that evidence. State v. Croom (Jan. 18, 1996), Cuyahoga App. No. 67135, unreported. Consequently, appellant's third and sixth assignments of error also lack merit.
Appellant further contends the prosecutor engaged in misconduct when he called Johnson as a witness. Appellant asserts the prosecutor's failure first to ascertain whether Johnson would testify prejudiced appellant. The record belies this assertion since Johnson refused to provide any evidence whatsoever against appellant.
The conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. State v. Papp (1978), 64 Ohio App.2d 203, cited with approval in State v. Maurer (1984), 15 Ohio St.3d 239. Johnson's simple recalcitrance to be a witness for the prosecution against appellant at appellant's trial cannot meet this stringent standard. Therefore, appellant's seventh assignment of error also fails.
Appellant next contends the trial court prevented him from lodging objections during those portions of the trial relating to Johnson's testimony and statements Johnson made to Manzatt. Once again, the record fails to support this contention.
The record demonstrates instead that appellant made several objections. The trial court either made its rulings on objections at that time or waited for a convenient time to consider appellant's arguments with regard to his objections outside of the jury's hearing. The trial court's actions were within its prerogative pursuant to R.C. 2945.09 and R.C. 2945.03. This court finds no error in the trial court's exercise of its prerogative; therefore, appellant's fourth assignment of error also is overruled.
Lastly, appellant incongruously argues the trial court should have given instructions to the jury regarding the scrutiny of a co-defendant's testimony[3] but then asserts appellant did not desire such an instruction since the evidence should not have been emphasized to the jury in any way.
Since appellant neither requested nor desired such an instruction, this court cannot determine the trial court improperly exercised its discretion pursuant to Crim.R. 30. See, e.g., State v. Frost (1984),14 Ohio App.3d 320; cf., State v. Dale (1982), 3 Ohio App.3d 431.
Consequently, appellant's eighth assignment of error also is overruled.
Appellant's fifth assignment of error states:
 THE COURT ERRED IN ALLOWING THE INTRODUCTION OF IRRELEVANT TESTIMONY REGARDIN (SIC) A VERBAL FIGHT BETWEEN TWO PERSONS, NIETHER (SIC) OF WHICH WAS THE APPELLANT OR THE VICTIM, AS WELL AS TESTIMONY REGARDING AN AK-47 THAT WAS NOT CONNECTED TO THIS CRIME.
Appellant argues the trial court improperly allowed the introduction of evidence regarding the altercation that took place between Johnson and appellant and Stowers and his friends on the evening prior to the murder. Appellant further argues the introduction of evidence that he and, later, Johnson possessed a weapon that was not the murder weapon constituted prejudicial error. Appellant's arguments are not persuasive.
Evid.R. 404 states in pertinent part:
(B) Other Crimes, Wrongs or Acts.
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
(Emphasis added.)
With regard to Evid.R. 404(B), the Supreme Court of Ohio has stated the following:
 If the other act does in fact tend to show by substantial proof any of those things enumerated, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, then evidence of the other act may be admissible. (State v. Flonnory [1972], 31 Ohio St.2d 124, 128, 60 O.O.2d 95, 96-97, 285 N.E.2d 726, 729, followed.)
State v. Broom (1988), 40 Ohio St.3d 277, syllabus 1.
Furthermore, in State v. Matthews (1984), 14 Ohio App.3d 440, this court explained:
 * * * [T]he prosecutor argues proof of motive, intent and plan are proper purposes. To be relevant, * * * and therefore admissible, the other act testimony must [tend] to make the existence of any fact that is of consequence * * * more probable or less probable * * *. Evid.R. 401. * * * [I]f the evidence is relevant, it must be excluded [only] if its probative value is substantially outweighed by the danger of unfair prejudice * * *. Evid.R. 403(A). * * * [Citations omitted.]
(Emphasis added.)
In this case, evidence of the earlier dispute between appellant and Johnson and Stowers' associate Harris was highly relevant to the state's case since it provided both the immediate background and the motive for the killing. See, e.g., State v. Martin (1985), 19 Ohio St.3d 122.
Johnson and appellant had endured behavior from Harris that initially seemed patronizing. Their hostility grew as Harris became more aggressive. The eventual confrontation between the two groups out on the street, however, was unsatisfactorily concluded. Although Beller was only an observer of the outdoor altercation, he also was a source of a significant commodity for Stowers and his followers, viz., providing transportation. Beller's elimination, therefore, indirectly would both hurt Stowers and Harris and demonstrate to them the dire consequences of their earlier confrontation with appellant and Johnson. State v. Lewis (Dec. 26, 1991), Cuyahoga App. No. 59465, unreported.
Similarly, evidence of appellant's possession of an AK-47 also was relevant. Charles Santamaria, the witness who identified the murder weapon as appellant's, stated he first had seen the murder weapon when he invited appellant to accompany him and Beller as they went shooting at a relative's rural retreat. Santamaria testified appellant possessed an AK-47 that was appropriate for the occasion but was disappointed when informed the murder weapon had to be left at home.
Moreover, during his testimony, Manzatt stated he discovered AK-47 bullets in the vehicle console next to Beller's body. Since the introduction of evidence relating to the AK-47 thus tied appellant to both the murder weapon and the scene of the crime, it was appropriate pursuant to Evid.R. 404(B). State v. Broom, supra.
For the foregoing reasons, appellant's fifth assignment of error is overruled.
Appellant's first assignment of error states:
 THE COURT'S SUBSTITUTION OF AN ALTERNATE JUROR, AFTER DELIBERATIONS HAD BEGUN, WITHOUT INSTRUCTING THE JURY TO BEGIN DELIBERATIONS ANEW WAS A PLAIN ERROR THAT DEPRIVED APPELLANT OF THE RIGHT TO A TRIAL IN WHICH ALL JURORS PARTICIPATED IN DELIBERATIONS WHICH LED TO [ITS] VERDICT.
Appellant argues reversible error occurred when the trial court replaced one of the jurors with an alternate during the jury's deliberation of its verdict. Appellant contends the trial court's failure to give any additional instruction affected his right to have his guilt determined by the entire jury. This court disagrees.
A review of the record reveals that near the conclusion of the state's case-in-chief, Juror No. 6 approached the trial court. Immediately thereafter, the trial court explained to the parties on the record it had been notified Juror No. 6 was acquainted with one of the state's witnesses. Appellant accepted this information with neither a request for Juror No. 6 to be interviewed nor any comment.
Upon the conclusion of the entire case on Thursday afternoon, October 28, 1999, the trial court imparted its instructions to the jury. The trial court then dismissed the alternate jurors with a reminder not to discuss the case until the case had been completely concluded.
The following day, after the jury had deliberated for a number of hours, Juror No. 6 again requested to speak with the trial court. The trial court notified the parties, then conducted an interview. Juror No. 6 indicated she felt intimidated by her acquaintance with a witness, viz., someone whom appellant knew so well. The trial court thereafter stated Juror No. 6 would be dismissed for cause.
At that point, the following discussion ensued:
 [PROSECUTOR]: How do we plan on if she is dismissed for cause, what's our next step?
 THE COURT: Well, we can try and get an alternate back. I don't know how successful we would be. And if not, then we are just going to mistry it and start again.
 [LEAD DEFENSE COUNSEL]: Did [the prosecutor] give an answer? I don't know if he answered.
THE COURT: Does the State object?
[PROSECUTOR]: No, we don't have any objection.
THE COURT: Does the defendant object?
[DEFENSE COUNSEL]: No, your Honor.
 [LEAD DEFENSE COUNSEL]: We don't object to anything you do.
A short time later, the trial court informed the parties the first alternate juror was on her way. The trial court placed the following on the record:
 THE COURT: Juror No. 12, * * * as we all know, we excused in chambers, and that was in the record. She is replaced by the first alternate.
 [LEAD DEFENSE COUNSEL]: Juror No. 6, your Honor. Wasn't it 6?
 THE COURT: You are right. Juror No. 6. That's correct. And she was replaced by the first alternate, * * *. And that was everybody's agreement. On behalf of the State of Ohio, is that correct?
[PROSECUTOR]: Yes, your Honor, that's my understanding.
THE COURT: On behalf of the defense, is that correct?
[LEAD DEFENSE COUNSEL]: Yes, your Honor.
As is readily apparent from the foregoing, appellant not only failed to object to the trial court's procedures, he affirmatively agreed to them; hence, he has waived any argument with respect to this issue. State v. Williams (1977), 51 Ohio St.2d 112.
Appellant attempts to overcome this impediment by invoking the doctrine of plain error. Notice of plain error, however, is to be taken only under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91.
In view of the fact the alternate jurors were present when the trial court gave the jury its final instructions in this case, plain error does not exist. Prior to excusing anyone, the trial court admonished both the members of the jury and the alternates that in coming to a verdict, each was to consider the binding rules of law but also was to consider the views that the other jurors might present in order to arrive at a common conclusion that was fair and impartial. Further instruction upon the arrival of the replacement juror, therefore, was unnecessary. Under these circumstances, the trial court did not commit plain error.
Accordingly, appellant's first assignment of error also is overruled.
Appellant's ninth assignment of error states:
 THE JUDGMENT RENDERED BY THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant argues the jury's verdict of guilt is unsupported by the weight of the evidence. Appellant asserts consideration of the factors cited in State v. Mattison (1985), 23 Ohio App.3d 10 lends support to his argument. This court disagrees.
In State v. Martin (1983), 20 Ohio App.3d 172 at 175, the court set forth the test to be utilized in addressing the issue of manifest weight of the evidence:
 Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * * See Tibbs v. Florida (1982), 457 U.S. 31, 38, 42.
(Emphasis added.) Cited with approval, State v. Thompkins (1997),78 Ohio St.3d 380.
A reviewing court will not reverse a verdict where there is substantial evidence upon which the trier of fact could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt. State v. Eley (1978), 56 Ohio St.2d 169; State v. Jenks (1991),61 Ohio St.3d 259. Moreover, the weight of the evidence and the credibility of the witnesses are matters primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
A review of the record in this case demonstrates appellant's conviction for aggravated murder (murder committed with prior calculation and design) was in accord with the manifest weight of the evidence. In stating this, this court is mindful that an appellate court need not subject circumstantial evidence of guilt to a standard of proof other than proof beyond a reasonable doubt. State v. Jenks, supra.
The testimony of the state's witnesses created a compelling scenario that was corroborated by the physical evidence presented. The jury reasonably could conclude from the evidence presented that following the altercation between themselves and Stowers' group, appellant and Johnson conceived a plan to take their revenge by luring Beller with telephone calls and messages sent to his pager to a deserted location with promises to repay a debt. Their plan succeeded. While seated in the rear of Beller's vehicle with Johnson, appellant used the .40 caliber handgun he often kept in his waistband to fire several bullets into the back of Beller's head. Both appellant and Johnson were sprayed with blood and brain matter during the killing. Upon exiting Beller's vehicle, appellant discarded the weapon since he believed he had rendered it untraceable when he removed its serial number with a grinding tool. Since Johnson and appellant left the scene in the Cadillac, Johnson was compelled as soon as possible to thoroughly clean the interior of his vehicle. The fabric in the Cadillac still was damp when examined a few days later by police investigators.
Appellant's mother testified appellant had arrived home the night of January 12, 1999 and remained there; however, her testimony lacked credibility in view of the contradictory statements she made just prior to appellant's arrest. Moreover, her testimony directly was contradicted by some of the state's witnesses.
In short, the record fails to indicate the jury lost its way in resolving conflicts in the evidence; therefore, its verdict finding appellant guilty of aggravated murder was not against the manifest weight of the evidence. State v. Cotton (1978), 56 Ohio St.2d 8; State v. Jenkins (Feb. 2, 2000), Cuyahoga App. No. 75343, unreported.
Appellant's ninth assignment of error, accordingly, is overruled.
Appellant's conviction and sentence are affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J. and JOYCE J. GEORGE, J.* CONCUR.
 _________________________________ KENNETH A. ROCCO, PRESIDING JUDGE
* Sitting by Assignment: Joyce J. George, retired Judge of the Ninth Appellate District.
[1] Quotes indicate testimony given at appellant's trial. Witnesses defined a "blunt" as a marijuana cigar.
[2] Subsequent testimony indicated the parking area had been empty within the hour prior to the discovery of Beller's vehicle.
[3] Appellant makes this argument despite Johnson's failure to provide any pertinent testimony.